# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        Plaintiff,

vs.                                                                                              Cr. No. 18-2851 JCH

**ROBERTO CASSOLA,**

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendant Roberto Cassola's Motion to Suppress* [Doc. 53]. In the motion, Cassola asks the Court to suppress all evidence, including his statements, obtained as a result of the search of his home at 8 Cawge Road in Los Lunas, NM on June 20, 2018. The motion was fully briefed [Docs. 53 and 55], and on December 17, 2019, the Court held a hearing on the motion. At the hearing, at which Defendant was present, counsel for both parties presented oral argument but no evidence. The Government filed an unopposed motion [Doc. 58] for leave to file supplemental briefing on the issue of inevitable discovery, which the Court granted. On February 26, 2020, supplemental briefing [Docs. 71, 72, and 81) was complete and the motion was ripe for decision.

## BACKGROUND FACTS

The search of Cassola's home at 8 Cawge Road in Los Lunas, New Mexico, took place on June 20, 2018. The search was supported by a warrant signed by United States Magistrate Judge Ritter. In support of the June 18, 2018 warrant application, Drug Enforcement Agency ("DEA") Task Force Officer Clarence Davis signed an affidavit. In it Davis avers that he is been a Task Force Officer for six years and a certified law enforcement officer in New Mexico for 31 years. He also has training and

experience in the investigation of drug trafficking crimes. In his affidavit, Davis asserts the following as the factual basis for the warrant:

1) **August 29, 2016**—the DEA used a confidential informant, CS-1, to conduct a controlled purchase of meth from the target location, 8 Cawge Road in Los Lunas. Davis avers that 8 Cawge Road is Cassola's residence. Under surveillance from law enforcement, CS-1 met with Cassola at the residence and later returned with a clear plastic bag containing methamphetamine. CS-1 said that Cassola had retrieved the drugs from his garage. According to the affidavit, CS-1 had pending criminal charges against him at the time, and he had previously provided law enforcement with credible information that had resulted in successful search warrants. The affidavit provides no other information regarding the credibility or reliability of CS-1.

2) **February 28, 2018**—DEA agents interviewed an undisclosed source of information (SOI), who said that Cassola was distributing methamphetamine from his home in Los Lunas. The SOI said that Cassola had recruited him/her to transport meth from Phoenix, and that he/she had delivered multi-pound amounts to 8 Cawge Road in October of 2017. The SOI said that he/she had personally observed multi-pound amounts of methamphetamine at the target location. The SOI, who was not working for money or consideration for criminal offenses, "provided specific travel information, which was later corroborated by agents through the issuance of subpoenas and independent investigation," though the affidavit does not say what the information was or how it was corroborated. The affidavit contains no further evidence regarding the SOI's reliability.

3) **March 26, 2018**—DEA agents used an undercover task force officer to conduct a purchase of one-half pound of methamphetamine from Samuel Sanchez and Alex Fuentes, who they believed were possible criminal associates of Cassola. The undercover officer met with Fuentes in a parking lot, where they awaited the arrival of Sanchez with the drugs. In the meantime, using surveillance cameras the DEA was able to observe Sanchez arrive at 8 Cawge Road in a Hyundai Elantra, leave his car, and carry a black bag toward a silver Ford Explorer parked on the property. Sanchez entered the Explorer, which immediately drove away and then returned to 8 Cawge Road about ten minutes later. Sanchez then returned to his Hyundai Elantra and drove to the public parking lot where the undercover officer and Fuentes were waiting for Sanchez to deliver the meth. Either Fuentes or Sanchez reached into a black bag and removed a clear plastic bag containing what appeared to be meth and then handed it to the undercover officer. Then, the agent handed Sanchez $2,900 and observed additional amounts of meth in the black bag. The substance tested positive for methamphetamine.

4) **April 24, 2018**—DEA Task Force Officer Frank Chavez received a report from the Valencia County Sheriff's Department stating that a "concerned citizen" who wished to remain anonymous had walked into their offices wishing to provide information on Cassola. Then Chavez drove to the Sheriff's office to meet with this citizen, who admitted to being a drug user who had been purchasing drugs from Cassola for the past year, and that each purchase had occurred at Cassola's residence on Cawge Road in Los Lunas. The person stated that during the month of March he/she had personally seen Cassola in possession of multiple pounds of methamphetamine at 8 Cawge Road. He/she also said that Cassola supplied drugs to someone

named "Sammy." Based on the citizen's description of Sammy's home and the area around it, they believe the citizen was talking about Samuel Sanchez. The affidavit contains no information regarding the reliability of the anonymous concerned citizen, nor is there any mention of firearms in the residence or on the property generally.

5) **May 4, 2018**—there was a call to law enforcement from 8 Cawge Road reporting a burglary in progress. There, deputies met with Cassola's daughter, "Crystal," who said she had been threatened. She also said that her father and his criminal associates were involved in criminal activity on the property. The affidavit contains no other specifics about what type of criminal activity she was referring to. Deputies located a stolen vehicle on the property, as well as "plastic containers buried in the yard."

6) **May 7, 2018**—agents interviewed a cooperating defendant ("CD") in which the CD identified 8 Cawge Road as Cassola's residence. CD stated that Cassola was involved in the distribution of illegal drugs and trafficking of firearms, which he shipped to Mexico. The CD said that Cassola hid the weapons in barrels, which he kept buried near his garage. The CD admitted to being a criminal associate of Cassola's, that Cassola was distributing six to eight pounds of methamphetamine per week, and that he used surveillance cameras, police scanners, and armed guards to protect his operation. There are no specific dates given. The affidavit contains no information regarding the reliability of the CD.

7) **May 8, 2018**—the same undercover officer in the March 6 operation described above contacted Fuentes and arranged to purchase one pound of meth. The officer met with Fuentes, and the two of them then met with Sanchez on a ditch bank in Los Lunas. Sanchez directed Fuentes to get the meth out of a black bag out of Sanchez's vehicle. The officer saw Fuentes retrieve what appeared to be methamphetamine out of the black bag and bring it to the officer's vehicle. Fuentes placed the drugs on the center console, and the undercover officer paid him $6,000. Then Fuentes and Sanchez left together. The substance tested positive for methamphetamine. Later review of surveillance footage of 8 Cawge Road showed Sanchez arriving there on May 6, two days before the undercover purchase. Sanchez backed his SUV up to the detached garage and opened his rear hatch for a short period of time, and then drove away.

8) **May 25, 2018**—using the surveillance camera at 8 Cawge Road, Davis saw Cassola and two women leave the house through the front door and walk to a black Dodge pickup parked in the front yard. One woman was holding a white package, which she handed to the other woman. Davis averred that he recognized the package as being consistent with a one-pound bag of methamphetamine.

Davis avers that based on his "training, experience and participation in this and in similar investigations, [he believes] that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of

friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings."

The face of the application for search warrant contains the incorrect address, 5028 Cedro Way. That address (which was manually crossed out, and 8 Cawge Road written in by hand) belongs to Sanchez, not Cassola. The affidavit for the search of Sanchez's home reveals that on June 12, 2018, law enforcement conducted an undercover purchase involving Sanchez and Fuentes. That purchase did not involve either Cassola or 8 Cawge Road. The affidavit in that search warrant application said that there was probable cause to believe there were drugs in Sanchez's home. However, Davis' affidavit contains no information about what transpired during that undercover purchase and subsequent search.

## **DISCUSSION**

Cassola challenges the sufficiency of Task Force Officer Clarence Davis' affidavit in support of the warrant to search his home. First, he argues that the warrant affidavit fails to support probable cause that there would be drugs and guns found in the residence because: (1) the information is vague and does not provide the required nexus to Cassola's residence; (2) any facts contained the affidavit that might show illegal activity are tied to the detached garage, and not the residence itself; (3) the evidence contained in the affidavit is stale; and (4) the confidential informants are not reliable. Second, Cassola challenges the affidavit under *Franks*, asserting that it omits material evidence that would weigh against a finding of probable cause. Third, Cassola argues that the good faith exception does not apply because the officers' failure to knock and announce before the search demonstrates a lack of good faith. As a remedy, he asks for suppression of the evidence seized as a result of the search, or a *Franks* hearing to determine whether the Davis has knowingly or recklessly included false information in the affidavit that is material to the determination of probable cause. The Government disputes each of these arguments, and in the

4

alternative argues that even if a constitutional violation did occur, the evidence should not be suppressed due to the doctrine of inevitable discovery.

## I.     Burden of Proof

"A defendant challenging a search pursuant to a warrant has the burden of proof." *United States v. Harrison*, 566 F.3d 1254, 1256 (10th Cir. 2009) (citing *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994)). The parties are in agreement on this point.

## II.    Probable Cause

Cassola argues first that the search warrant affidavit lacks sufficient information to establish probable cause to search his home. Under the Fourth Amendment, probable cause must support the warrant authorizing the Government's search of Defendant's residence. See U.S. Const. amend. IV. (stating "no warrants shall issue, but upon probable cause"). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Court for Eastern Dist. of Mich.*, 407 U.S. 297, 313 (1972).

The "touchstone" of the Fourth Amendment is "reasonableness." *Samson v. California*, 547 U.S. 843, 855 n. 4 (2006). "An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Soderstrand*, 412 F.3d 1146, 1152 (10th Cir. 2005). Probable cause that someone is guilty of a crime does not alone establish probable cause to search that person's home, however. *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998). Rather, an affidavit seeking a warrant for a home must establish probable cause as to that home, or a link between the home and the criminal activity. *Id*.

In determining whether probable cause exists to issue a search warrant, a magistrate's task is to make a "practical, common-sense decision" based on the totality of the circumstances as set forth in the affidavit. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Reviewing courts should give the magistrate judge's ultimate probable cause decision "great deference." *United States v. Cusumano*, 83 F.3d 1247, 1250 (10th Cir. 1996) (en banc) (citation omitted). Nevertheless, the court will not defer to the magistrate judge's determination if the affidavit does not provide " 'a substantial basis for concluding that probable cause existed.' " *Id.* (quoting *Gates*, 462 U.S. at 238-39).

A. **Nexus**

Whether a sufficient nexus has been established between a defendant's suspected criminal activity and his residence thus necessarily depends upon the facts of each case. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (noting that probable cause "deals with probabilities and depends on the totality of the circumstances"). The Tenth Circuit has "never required, for example, that hard evidence or personal knowledge of illegal activity link a Defendant's suspected unlawful activity to his home. Instead, we have indicated that a sufficient nexus is established once an affidavit describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought are at a particular place." *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009) (citations and quotations omitted). In some cases, evidence linking an individual's suspected illegal activity to his home has thus come in the form of an affiant officer's statement that in his professional experience, evidence of criminal activity is likely to be found in a defendant's residence. *Id*. The Tenth Circuit has set forth a non-exhaustive list of factors relevant to the nexus analysis. *Id.* These include "(1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence." *Id*.

B. **Staleness**

6

Probable cause existing in the past is insufficient unless a court can infer from the circumstances that grounds to search continue to exist at the time the affidavit was filed. *Sgro v. United States*, 287 U.S. 206, 210 (1932). "[W]hether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *United States v. Mathis*, 357 F.3d 1200, 1207 (10th Cir. 2004) (quotation omitted). Furthermore, "otherwise stale information may be refreshed by more recent events," and "[w]hen the circumstances suggest ongoing criminal activity, the passage of time recedes in importance." *United States v. Cantu*, 405 F.3d 1173, 1177-78 (10th Cir. 2005) (concluding that defendant's prior arrests and drug conviction which ranged from 20 to six months old were refreshed by police surveillance of defendant in the days before his arrest). *See also United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two & 43/100 Dollars in U.S. Currency*, 965 F.2d 868, 873-74 (10th Cir. 1992); *United States v. Reyes*, 798 F.2d 380, 382 (10th Cir. 1986) (passage of time is of diminished significance where the activity is of a protracted and continuous nature); *United States v. Shomo*, 786 F.2d 981, 983 (10th Cir. 1986) ("where the affidavit recites facts indicating ongoing, continuous criminal activity, the passage of time becomes less critical.").

  C. **Specificity of Information and Reliability of the Informants**

The basis of a confidential informant's knowledge, as well as his reliability, are important factors in deciding whether information in an affidavit supports a finding of probable cause for a search. *See Illinois v. Gates*, 462 U.S. 213, 233 (1983); *United States v. Tuter*, 240 F.3d 1292, 1295 (10th Cir. 2001). However, the complete failure of an affidavit to discuss the reliability of an informant does not automatically preclude a finding of probable cause; rather, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). *See also United States v. Sturmoski*,

971 F.2d 452, 457 (10th Cir. 1992) (same). Nor is the affidavit's failure to discuss the informant's criminal history when outlining the informant's reliability automatically fatal. *See United States v. Hager*, 969 F.2d 883, 887 (10th Cir. 1992) (upholding affidavit despite omission of "informant's involvement in criminal activity"), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995). Rather, courts reviewing the alleged omission of information bearing on an informant's credibility ask whether, assuming the magistrate judge had been apprised of the omitted information, the judge still "would have found probable cause to issue the search warrant." *United States v. Kennedy*, 131 F.3d 1371, 1377 (10th Cir. 1997) (concluding that omission of information about drug dog trainer's failure to keep adequate records or train dog on regular basis from application for search warrant did not render warrant invalid, as affidavit did not include any affirmatively false statements, and information would not have altered magistrate's probable cause determination, since omitted information would still have shown dog to have 70-80% success rate); *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000) (finding no material omission in warrant affidavit that failed to include information that police reports written by certain officers did not repeat the officers' oral statements that they saw drugs in the back of defendant's car). In asking this question, it is important to keep in mind that "[a] magistrate judge's task in determining whether probable cause exists to support a search warrant 'is simply to make a practical, common-sense decision whether, given all the facts and circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Kennedy*, 131 F.3d at 1378 (quoting *Gates*, 462 U.S. at 238).

    **D.**    **Analysis**

Here, the affidavit sets forth statements from a confidential informant who performed a controlled buy from Cassola at the residence at 8 Cawge Road, as well as an undisclosed "source of

information," an anonymous "concerned citizen," and an unnamed cooperating defendant. The affidavit contains little to no information regarding the reliability of any of these sources. On the other hand, these unnamed individuals' accounts largely corroborate each other, in that their stories are consistent. Specifically, each of them states that Cassola was distributing methamphetamines out of his home. They are also corroborated by the information obtained by the undercover officer during two drug buys—to wit, that Cassola appeared to be distributing meth to Sanchez and Fuentes from his residence at 8 Cawge Road, that he obtained his supply from the Phoenix area, that Fuentes and Sanchez were participants in the drug distribution ring, and that they often visited 8 Cawge Road before a drug deal. An officer is not required to corroborate information received from an informant through personal observation. *Mathis*, 357 F.3d at 1204. "Rather, an officer simply must have knowledge of other matters that reasonably corroborate the informant's statements." *Id*. Finally, each of these anonymous sources seems to be transmitting information within his/her personal knowledge, as opposed to reporting information they heard from others. *See United States v. Mathis*, 357 F.3d at 1206 (finding that district court did not err in finding that affidavit provided reliable information where each cooperating witness personally knew Mathis and his residence and that the information provided by the informants was internally corroborated in several respects). The sources were further corroborated by surveillance footage of 8 Cawge Road taken several weeks before the search, which showed Cassola leaving the house with two women, one of whom was carrying a white plastic bag consistent with packaging for methamphetamine.

      In addition, the Court concludes that evidence described in the affidavit is not stale, but rather shows a pattern of long-term, ongoing criminal conduct. It is true that standing alone, some of the information is fairly old. However, the statements of the various informants and sources are consistent over an extended period of time. Evidence of a longstanding pattern of repeated activity makes it less likely that the activity has ceased within a short time frame. *Mathis*, 357 F.3d at 1207 (concluding that

the passage of time was less critical when judging staleness of information, where defendant was suspected of continuous and ongoing drug activity over 18-month period); *United States v. Le*, 173 F.3d 1258, 1267 (10th Cir. 1999). They are also consistent with the assertions of the undercover officer. The statements disclose continuing criminal distribution of methamphetamine by Cassola from 8 Cawge Road in the months leading up to the search and therefore support a conclusion that this was a continuing criminal enterprise.

Finally, the information provided in Davis' warrant affidavit does tie the presence of methamphetamine and guns to both the residence at 8 Cawge Road and the associated detached garage. (The application for search warrant includes a request to search the entire property, including the outbuildings.) In the affidavit, Davis describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought—illegal narcotics and firearms—would be in the home and garage at 8 Cawge Road. This includes not only the statements from various informants, but also Davis' opinion, based on his six years of professional expertise as a task force officer and 31 years as a law enforcement officer, that drug traffickers often keep evidence of their illegal activities, including both drugs and firearms, in their home, particularly when a suspect has no place of business separate from his residence. *See United States v. Medlin*, 798 F.2d 407, 409-10 (10th Cir. 1986) (concluding that defendant's lack of a separate place of business made it objectively reasonable to conclude that he would keep contraband in his home).

Taken together, the Court concludes that the warrant affidavit provides sufficient probable cause to search for firearms and illegal narcotics at the home and other buildings at 8 Cawge Road.

### III. *Franks* Challenge

Cassola challenges the search warrant on the grounds that Davis omitted material information that, if included, would have undermined the magistrate judge's finding of probable cause. "Under

*Franks v. Delaware*, a hearing on the veracity of the affidavit supporting a warrant is required if the defendant makes a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). "The standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods." *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000). If, after considering the evidence presented at a *Franks* hearing, the district court concludes by a preponderance of the evidence that the affidavit contains "intentional or reckless false statements," *Kennedy*, 131 F.3d at 1376, or "material omissions," *McKissick*, 204 F.3d at 1297, "then the district court must suppress the evidence obtained pursuant to the warrant." *Id*. If, however, the district court concludes that the omitted information would not have altered the magistrate judge's decision to authorize the search, then the fruits of the challenged search need not be suppressed. *Id*. at 1297-98; *Kennedy*, 131 F.3d at 1376.

Cassola argues that Davis knew or reasonably should have known that Sanchez and Fuentes engaged in drug sales not involving Cassola or his residence as recently as June 12, 2018, just days before submitting their application for search warrant for Cassola's home. Cassola points out that Davis knew of these events because he submitted an affidavit in support of a warrant to search Sanchez's home at 5028 Cedro Way in Los Lunas, and in his affidavit he described a controlled buy between Fuentes and an undercover agent in which Fuentes appeared to have retrieved the drugs from Sanchez's home prior to the transaction. Davis' affidavit in support of that search warrant did not describe any participation by Cassola or involvement of his home in that particular transaction. Cassola argues that if this information had been included in the affidavit to support the warrant to search his home, 8 Cawge Road, it would have vitiated probable cause. According to Cassola's argument, this information would

have shown the magistrate judge that Sanchez an Fuentes were narcotics distributors, and that drugs and guns were not likely to be found in Cassola's home.

The Court concludes that if Davis had included in his affidavit the information about the June 12 drug transaction involving Sanchez and Fuentes, it would not have undermined the magistrate judge's finding of probable cause to search 8 Cawge Road. The affidavit contained evidence that on March 26 and May 6, 2018, Sanchez picked up methamphetamine from Cassola at 8 Cawge Road. The fact that Sanchez may have had methamphetamine stored and ready for sale at his home does not negate the probable cause to believe that Cassola also kept methamphetamine and guns at his own home at the same time. Accordingly, the Court will deny Cassola's request for a *Franks* hearing.

## IV.     Applicability of the Good Faith Exception

In the event a search warrant is not supported by probable cause, the search may still be legal if the court finds that officers reasonably relied in good faith on the sufficiency of the warrant issued by a neutral and detached magistrate. *United States v. Leon*, 468 U.S. 897 (1984). The good faith exception is often applied in situation where a warrant lacked probable cause or failed the Fourth Amendment's particularity requirement. Here, the Court has already concluded that the warrant was supported by probable cause. Therefore, it examines the question of good faith in the alternative, in the event the warrant is later found to be lacking probable cause

The *Leon* good-faith exception does not apply when: (1) the magistrate judge issuing the warrant was misled by a deliberately or recklessly false affidavit; (2) the magistrate judge wholly abandoned his or her detached and neutral judicial role; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient that the executing officers cannot reasonably presume it to be valid. *Leon*, 468

U.S. at 923. In such instances, "a reasonably well trained officer would have known that the search was illegal [,]" *Herring v. United States*, 555 U.S. 135, 145 (2009) (internal citations and quotation marks omitted), and, as a result, suppression of the unlawfully obtained evidence remains an appropriate remedy. *See United States v. Rowland*, 145 F.3d 1194, 1215-16 (10th Cir. 1998) (discussing these limitations to the *Leon* good-faith exception).

In this case, Cassola asserts that such good faith is absent because Davis was deliberately or recklessly false in leaving out the information about the June 12, 2018 drug buy not involving Cassola, and because the warrant fails on its face to establish probable cause such that officers could not reasonably rely on it. However, the Court has already determined that the omission of the June 12 drug buy did not render Davis' affidavit deliberately or recklessly false. Omitting information about a drug transaction not directly involving Cassola does not, in this Court's view, reduce the probability the drugs and guns would be found in Cassola's home. Similarly, the Court has already determined that the affidavit sets forth sufficient facts on its face to support probable cause; therefore, officers were not unreasonable in relying upon the resulting search warrant.

Finally, Cassola briefly argues that the failure of law enforcement to "knock and announce" their presence at Cassola's home before executing the search warrant demonstrates their lack of good faith. While Cassola acknowledges that Davis' affidavit set forth a request for permission to enter the property without knocking, he contends that the actual warrant signed by the magistrate judge does not indicate that such authorization was granted. He asserts that the magistrate judge failed to "check the box" authorizing a no-knock search. However, as the Government correctly points out, there is no "box" for the magistrate to check on the warrant form indicating whether or not he is granting permission for a no-knock search. *See* Doc. 53-2. Based on the evidence before

the Court, it is clear that Davis requested such permission, and that the magistrate judge did not expressly deny it.

The parties have agreed that as the party challenging the warrant, the defendant has the burden of proof. However, Cassola has not demonstrated—by citation to either evidence or legal precedent—that the warrant as written did not permit the officers to enter the premises without knocking. Furthermore, the matter may be moot. In 2006, the Supreme Court held that when police officers violate the Fourth Amendment's knock-and-announce requirement, the exclusionary rule does not apply. *Hudson v. Michigan*, 547 U.S. 586 (2006). That being the case, it is far from clear that violation of the know-and-announce rule should vitiate the good faith exception. If it does, Cassola has not explained how or why. Accordingly, the Court concludes that the good faith exception to the warrant requirement applies.

V. **INEVITABLE DISCOVERY**

In light of the conclusions that the affidavit contained sufficient facts to establish probable cause, that a *Franks* hearing is unnecessary, and that the good faith exception does apply, the Court will not reach the parties' arguments relating to the inevitable discovery doctrine.

**IT IS THEREFORE ORDERED** that *Defendant Roberto Cassola's Motion to Suppress* [Doc. 53] is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**